UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF JOSE TRINIDAD MARTINEZ SANTOYO TO THE REPUBLIC OF MEXICO. | No. 2:21-mj-125-KJN<br><br>ORDER<br><br>(ECF Nos. 6, 45.) |

The United States Government filed a complaint in this matter regarding the extradition of Jose Trinidad Martinez Santoyo ("Martinez") at the request of and pursuant to a treaty with Mexico. The U.S. contends the undersigned is authorized to conduct the extradition proceeding, the court has jurisdiction over Martinez, the treaty is in full force and effect, the charged crime (Intentional Aggravated Homicide, unfair advantage) is covered by that treaty, and sufficient evidence exists to support a finding of probable cause on the charge.[1]  (ECF Nos. 1, 6, 45.)

Martinez opposes extradition, contending probable cause is lacking because the evidence tying him to the killing: (I) is mostly based on testimony from three purported eyewitnesses whose statements contain inconsistencies; and (II) fails to show the killing was by "undue advantage."  (ECF No. 51.)  The U.S. contends ample evidence exists for the court to find probable cause that Martinez shot and killed the victim with "unfair advantage."  (ECF No. 53.)

For all of the reasons set forth herein, the court finds that Martinez is certified for

---

[1] This matter proceeds before the undersigned pursuant to Local Rule 302(b)(8).

1

extradition to Mexico.

**Allegations in the Extradition Packet; Procedural Posture**

In the early morning hours of December 21, 2013, Jose Luis Vela Miranda ("Vela Miranda") was shot and killed outside of a pool hall in Tenzompa, state of Jalisco, Mexico. Officials from the police and prosecutor's office investigated the shooting, which included collecting eyewitness statements from Baudelio Oronia Conchas, Pedro Oronia Conchas, and Manuel Miranda Miranda.[2]

These three stated that late in the evening on December 20th, they were drinking outside the pool hall along with Martinez, Vela Miranda, and one other person. Each of the three witnesses stated that between 3:00 and 3:30 a.m., Martinez and Vela Miranda began to argue, Martinez became aggressive, and the two moved about 10 meters away from the group and toward Vela Miranda's truck. Manuel and Pedro heard Martinez challenge Vela Miranda to a fight, saying he was "not a man." Pedro heard Vela Miranda reply that he was a man "since he was born" and that a fight was unnecessary. They then indicated Martinez pointed a pistol at Vela Miranda's head and fired two shots at close range; Manuel said he saw a flash and heard shots; Pedro said he heard the shots. The three witnesses saw Vela Miranda fall to the ground and saw Martinez walk away. They fled, reportedly in fear of Martinez. At a later date, Baudelio, Pedro, and Manuel identified Martinez from a photo array. (See ECF No. 45-1 at 20-32.)

On January 31, 2014, an arrest warrant for Martinez was issued by a court in Jalisco on the charge of Aggravated Intentional Homicide with Advantage. (See id. at 25-26; 90-126.) Sometime in late 2020 or early 2021, Mexico submitted a provisional request to the U.S. seeking the arrest and extradition of Martinez; the U.S. filed a complaint on August 9, 2021. (ECF No. 1.) Martinez was arrested and the U.S. requested extradition in May of 2022. (ECF Nos. 5, 6.) The U.S. formally moved to extradite Martinez on November 9, 2022. (ECF No. 45.) Martinez opposed, and the U.S. filed a reply brief. (ECF Nos. 51, 53.) The court held a hearing on the matter on February 22, 2023. (ECF No. 54.)

---

[2] Given the familial relations, the court refers to these individuals by their first names. No disrespect is intended.

**Legal Standards for Extradition Proceedings**

"Extradition from the United States is a diplomatic process [] initiated by a request from the nation seeking extradition directly to the Department of State." Prasoprat v. Benov, 421 F.3d 1009, 1012 (9th Cir. 2005); see Factor v. Laubenheimer, 290 U.S. 276, 287 (1933) ("[T]he principles of international law recognize no right to extradition apart from treaty."); see also Quinn v. Robinson, 783 F.2d 776, 782 (9th Cir. 1986) ("The right of a foreign sovereign to demand and obtain extradition of an accused criminal is created by treaty."). If the State Department determines the extradition request falls within the treaty, a United States Attorney files a complaint in the district court seeking arrest and extradition of the accused. Id.; Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016).

After arrest, a magistrate judge is permitted "to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation, and to issue a certification of extraditability to the Secretary of State." In re Extradition of Santos, 795 F. Supp. 2d 966, 969 (C.D. Cal. 2011); see also 18 U.S.C. § 3184; Local Rule 302(b)(8) (referring all extradition proceedings to magistrate judges). The court has limited authority in the overall process of extradition, as "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." Vo v. Benov, 447 F.3d 1235, 1237 (9th Cir. 2006); see also Wright v. Henkel, 190 U.S. 40, 57 (1903) ("Treaties must receive a fair interpretation, according to the intention of the contracting parties, and so as to carry out their manifest purpose."); Santos, 795 F. Supp. 2d at 970 ("Extradition treaties are to be liberally construed so as to effect their purpose, that is, to surrender fugitives for trial for their alleged offenses.") (quoting Valentine v. U.S. ex rel. Neidecker, 299 U.S. 5 (1936)).

In an extradition hearing, there are no discretionary decisions for the court to make. Prasoprat, 421 F.3d at 1012. The court cannot consider whether the accused is guilty; it is instead to determine whether competent legal evidence justifies extradition. Collins v. Loisel, 259 U.S. 309, 315-16 (1922). If the court "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention . . ., [it] shall certify the same, together with a copy of all the testimony taken . . . ." 18 U.S.C. § 3184; see Santos, 830 F.3d at 992 ("So long as the

judicial officer determines that there is probable cause, [that officer] is required to certify the individual as extraditable to the Secretary of State."). The Secretary of State retains the discretion to actually surrender the accused. Prasoprat, 421 F.3d at 1012.

In deciding whether to grant a request for a certificate of extradition, courts consider whether: (1) the extradition judge has jurisdiction to conduct the proceedings; (2) the extradition court has jurisdiction over the accused; (3) the extradition treaty was in full force and effect; (4) the crime fell within the terms of the treaty; and (5) there was competent legal evidence to support an extradition finding. Zanazanian v. U.S., 729 F.2d 624, 626 (9th Cir. 1984).

Regarding "competent legal evidence," it is axiomatic that "[f]oreign states requesting extradition are not required to litigate their criminal cases in American courts." Santos, 830 F.3d at 991. In making a finding on competent legal evidence, the court is to "determine whether there is any evidence sufficient to establish reasonable or probable cause." U.S. ex rel Sakaguchi v. Kaulukukui, 520 F.2d 726, 730-31 (9th Cir. 1975). The probable cause inquiry asks whether there is "a reasonable ground to believe the accused guilty." Mirchandani v. United States, 836 F.2d 1223, 1226 (9th Cir. 1988) (citations omitted); see also Garcia v. Cty. of Merced, 639 F.3d 1206, 1209 (9th Cir. 2011) (noting probable cause equates to a "fair probability" that the suspect has committed the charged crime). Evidence in support of an extradition request need not be admissible at a later trial. See Then v. Melendez, 92 F.3d 851, 855 (9th Cir. 1996) (noting that rules of evidence do not apply in extradition context); see also Fernandez v. Phillips, 268 U.S. 311, 312 (1925) ("Competent evidence to establish probable cause is not necessarily evidence competent to convict."). To this end, courts have held that a certificate of extradition can be supported by hearsay, id., self-incriminating statements of accomplices, Zanazanian, 729 F.2d at 627, or summaries of witness statements composed by police officers or prosecutors, id. at 628; Emami v. U.S. Dist. Ct. for N. Dist. of California, 834 F.2d 1444, 1451 (9th Cir. 1987).

The burden of demonstrating probable cause rests with the extraditing country, via the U.S.'s submissions. Then, 92 F.3d at 855. The court may consider the credibility of the proffered evidence and weight to give it. See Quinn, 783 F.2d at 815. Further, an extradition court may only consider evidence brought by the accused that is "explanatory" and not "contradictory." See

Santos, 830 F.3d at 1007 (indicating the accused may offer evidence "which might have explained ambiguities or doubtful elements" of the U.S.'s case, such that the evidence "explains away or completely obliterates probable cause") (citing Collins, 259 U.S. at 316; Hooker v. Klein, 573 F.2d 1360, 1369 (9th Cir. 1978)).

### Analysis

Martinez does not challenge the authenticity of any of the evidence in the extradition packet at ECF No. 45-1.  The court finds the evidence submitted to be properly authenticated and admissible pursuant to 18 U.S.C. § 3190.  Further, Martinez does not contest the first four considerations outlined in Zanazanian.  (See ECF No. 51.)  The court finds:  (1) the undersigned has jurisdiction to conduct the proceedings (18 U.S.C. § 3184; Local Rule 302(b)(8)); (2) the court has jurisdiction over Martinez because he was arrested within the court's boundaries (see, e.g., In re Extradition of Camelo-Grillo, 2017 WL 2945715, at *5 (C.D. Cal. July 10, 2017)); (3) the extradition treaty between the U.S. and Mexico is in effect (see ECF No. 45-1 at 2 ¶ 2 (decl. Heinemann, State Dept. legal adviser); id. at 33-52 (the Treaty provisions)); and (4) the charged crime falls within the scope of this treaty (see id. at 2 ¶ 5; 36-37).

Finally, Martinez does not contest the fact that Vela Miranda was shot and killed in December of 2013 in Jalisco, Mexico.  (See ECF No. 51.)  The extradition request contains the following evidence regarding these facts:  the prosecutor's summation of the case, the prosecutor's summary of the exhibits, and the exhibits themselves:  the Arrest Warrant [Ex. A], the statements of the three eyewitnesses [Exs. D-F], the December 21, 2013 report after the crime-scene inspection [Ex. G-H], and the autopsy report [Ex. I].  (ECF No. 45-1 at 21-24; 25-30, 89-126; 136-37; 141-42; 147-48; 153-55; 157-59; 161-68.)  The court finds competent legal evidence exists in the extradition packet to support a finding that Vela Miranda was shot and killed on December 21, 2013, outside of the pool hall in Tenzompa, Jalisco, Mexico.  Then, 92 F.3d at 855 (hearsay statements accepted in extradition proceedings); Zanazanian, 729 F.2d at 628 (summaries of witness statements composed by police officers or prosecutors accepted in extradition proceedings).

///

Martinez primarily argues the evidence does not support a finding of probable cause that: (I) Martinez was the shooter, given the only evidence tying him to the shooting are the three eyewitness statements which contain inconsistencies; and (II) the homicide was carried out with "undue advantage," given that (a) the judge who issued the warrant only cited the definition of "advantage" and did not discuss the "undue" portion, (b) the extradition packet arguably contains no evidence to meet any of the definitions of "unfair advantage stated in Article 219(I) in the Homicide chapter of the Criminal Code of Jalisco, and (c) a forensic report indicates Vela Miranda had gunshot residue on his hands, implying Martinez did not have an advantage because Vela Miranda was also armed.  (ECF No. 51.)

The U.S. contends: (I) the Mexican prosecutor's summary and the three eyewitness statements provide a basis for a court to find probable cause that Martinez was the shooter; and (II) Martinez's arguments regarding the "undue advantage" portion of the charge are impermissible attempts to contradict the evidence in the record.  (ECF No. 53.)

**I.        Probable Cause Regarding Martinez as the Shooter**

Given how central the three witnesses' statements are to Mexico's case in identifying Martinez as the shooter, the undersigned reproduces the relevant portions, each made on December 22, 2013:

- Statement of Baudelio Oronia Conchas (ECF No. 45-1 at 136-37):

> [O]n December 20[,] 2013, [] around 23:00 hours I was drinking some beers with [Pedro, Manuel, Vela Miranda, Martinez, and Rodrigo] outside the pool hall that is located in front of the main plaza of Tenzompa, Huejuquilla el Alto, Jalisco.
> ***
> [W]e went on drinking outside the pool hall, on Calle Abasolo, on the sidewalk, until about 3:00 hours in the early morning of Saturday, December 21 . . ., when [] Martinez and [] Vela Miranda started to argue, and they moved about 10 meters far from the place [where] we were towards the place where [Vela Miranda's] truck [] was parked [] on the street in front of the municipal plaza and in front of a grocery store, therefore I could not listen to what they were arguing because they were a bit far.  I could only see that [] Martinez was very aggressively arguing with [] Vela Miranda, since they were about 1 meter far from each other, and suddenly I saw that [] Martinez aimed with a gun at [] Vela Miranda to the head.  I did not see where he took it from because everything happened so fast, with the moonlight I could just see that he was holding it with his right hand and it was a square type short gun, whose caliber I

could not see, since in that moment I saw that [] Martinez shot at [] Vela Miranda, who only leaned on his truck, so in that moment [Martinez] took the gun with both hands and shot [] Vela Miranda again, also aiming at the head[.] [Vela Miranda] fainted slowly until he fell on the ground, and [Martinez] left walking very calmly towards the back of the truck and . . . to the east[.] [Pedro, Manuel, Rodrigo] and I ran to the other side, towards the west of the street[;] from there everybody went home[.] I do mention that when we witnessed the crime we ran because we were afraid that as we all had witnessed everything, [Martinez] had wanted to kill us too, because I know that [Martinez] is a very aggressive person and that he is regularly armed[.]

- Statement of witness Manuel Miranda Miranda (ECF No. 45-1 at 141-42):

[O]n Friday, December 20[,] 2013, in or around nine at night (21:00) I arrived in the pool hall . . . on Calle Abasolo No. 11 . . . . I arrived, had a few beers and started playing pool because there was many people. At eleven at night (23:00), the hall was closed because it is the time it regularly closes and I together with [Pedro, Baudelio, Rodrigo, and Martinez] remained outside the hall. Thereat, also arrived [] Vela Miranda, and he also had beer with us. Then, it started to rain hard, so we entered into a little room which is aside the pool hall . . . where we kept drinking while it was raining; when it stopped raining, we went back out and kept drinking on the sidewalk[.]
***
[A]round 03:00 at dawn of Saturday, December 21[,] Martinez and [Vela Miranda] started having a quarrel, but I do not know what it was about; I only remember that [Martinez] was telling [Vela Miranda] he was not a man and they moved about 10 meters from where [Vela Miranda's] truck . . . was parked.
***
After they left I did not manage to hear what was the quarrel about, because they were away and talked slowly [sic]. I noted they were very aggressive to each other and I was only able to hear that [Vela Miranda] was telling [Martinez] they should have a fight and [Martinez] said [Vela Miranda] was not manly enough and they should fire, but I never thought this was going to happen and it was a simple quarrel. I never imagined [Martinez] was holding a firearm, both looked equally drunk and they were 1 meter away from each other. I suddenly noted that [] Martinez shot at [] Vela Miranda, but I did not see the firearm well. I only saw light and knew that it was a shot because a very loud shot was heard; once again I saw that [Martinez] fired back at [Vela Miranda] by his head, so, in that moment, [Vela Miranda] was fainting by his truck and reached the ground; it was then that [Martinez] left walking, in a very slow way along Calle Abasolo towards his house; thereafter, [Baudelio, Pedro, Rodrigo] and myself ran toward Calle Hidalgo and therefrom each one left [for] home; we ran because we were much afraid that [Martinez] would kill us to eliminate witnesses[.]

///

- Statement of witness Pedro Oronia Conchas (ECF No. 45-1 at 147-48):

> [O]n December 20 of this year, 2013, in or around eleven at night (23:00), I closed the pool hall which I own and is named "Billar Tenzompa [] in Calle Abasolo No. 11. I regularly close at that time. When all the people inside left the hall, I remained outside along with my brother Baudelio, [Manuel, Martinez and Rodrigo]. [] Vela Miranda also joined us and he had some beer with us. Then, it began to rain, so I opened the door to a room that is aside the hall . . . . We stayed there for as long as it was raining; when it stopped raining, we went back out and we kept drinking on the sidewalk until around 03:00[.]
>
> \*\*\*
>
> It was already Saturday, December 21[.] [Martinez and Vela Miranda] started a quarrel, but I did not hear what they were quarreling about. I can only remember that [Martinez] was telling [Vela Miranda] he was not a man and [Vela Miranda] would reply that he was a man ever since he was born and they moved about 10 meters from the place [toward Vela Miranda's] truck
>
> \*\*\*
>
> [T]hereafter, I was not able to hear what they were quarreling about because they were away and spoke slowly [sic] and I was only able to see that [] Martinez was arguing in a very aggressive manner with [] Vela Miranda because they were around 1 meter away between both of them. Suddenly, I saw that [] Martinez aimed at [] Vela Miranda by his head with a gun which I did not see where he took it from, because everything happened really quickly and I did not see the type of gun it was; then I saw that [] Martinez fired at [] Vela Miranda who remained standing and leaned on his truck; then [] Martinez again fired at [] Vela Martinez [sic] on his head; then [Vela Miranda] slid over his truck and then he fell on the ground; it was then that [Martinez] walked away really slowly by the back of the truck and kept walking along . . . Calle Abasolo, towards the east; then [Baudelio, Manuel, Rodrigo] and myself ran to the opposite side; this is, towards the west of the street and left for Calle Hidalgo and therefrom, each left home. I should mention that when we witnessed this, we all ran because we were afraid that, since we witnessed this, [Martinez] might have wanted to kill us as well; I know that [Martinez] is a very aggressive person.

Each witness provided additional details not reproduced here, including a description of Vela Miranda's truck, details about the location, and statements that none of the three had seen Martinez since the event but that the passport photo each was shown was in fact Martinez. (See, generally, ECF No. 45-1 at 136-48.) Further, in July of 2015, Manuel, Baudelio, and Pedro each identified Martinez from a photo lineup. (See id. at 170-73, 175-78, 180-83.)

Also in support of its extradition request, Mexico submitted the numerous pieces of evidence proffered from Mexican authorities. This includes a statement of the case of the Mexican prosecutor (ECF No. 45-1 at 73-83), a description of the exhibit list (id. at 85-88), the

arrest warrant (id. at 90-123), statements from the officers who investigated the crime scene (id. at 153-55 and 57-59), the autopsy report (id. at 161-68), and Martinez's birth certificate and photo (id. at 185, 189).  Relevant to the identity of the shooter, the Mexican prosecutor noted the consistency of the witnesses' statements that they, Vela Miranda, and Martinez were drinking outside the pool hall in Tenzompa from 11:00 p.m. on December 20, 2013, through 3:00 a.m. on the 21st, and that Martinez and Vela Miranda began to argue aggressively and move toward Vela Miranda's truck.  (ECF No. 45-1 at 78-79.)  The prosecutor noted the multiple statements that Martinez challenged Vela Miranda's manhood, that the witnesses heard gunshots, and that Martinez left the scene immediately afterward.  (Id. at 79.)

        Martinez argues this evidence is insufficient for a finding of probable cause.  Martinez notes there is no physical evidence in the record tying him to the shooting, including a lack of any showing Martinez owned or possessed the gun, the absence of a gun in evidence, the failure of authorities to search the house where Martinez was staying (despite having spoken to Martinez's wife on December 21st), and the fact that the authorities did not test the two recovered shell casings for DNA or fingerprints.  Martinez also notes that the statements from Baudelio, Manuel, and Pedro were taken together, unsworn, and that their stories had changed slightly about what they witnessed.  For example, on December 21st, Pedro and Baudelio told the investigators they did not see the first shot but saw the second, but the following day they told the prosecutor they had seen the shooting, and in July of 2015 Baudelio said he only heard two shots.  (Cf. ECF No. 45-1 at 158; With id. at 136-148 and 176.)  Martinez also argues the photo array the witnesses were shown in 2013 was suggestive because the photo has Martinez's information on it, and notes that the reproductions in the extradition packet are dark and illegible.

        Martinez's arguments here are unpersuasive for the simple fact that probable cause is based on the totality of the circumstances.  Illinois v. Gates, 462 U.S. 213, 238 (1983).  True, Mexican authorities may not have Martinez's DNA or fingerprints from the shell casings, or any other physical evidence tying Martinez to the shooting.  Also true, the Mexican prosecutors appear to lack a single witness who can testify to all of Martinez's alleged words and actions on the night Vela Miranda was killed.  But on the totality, the three witnesses' statements and

prosecutor's summary raise a "fair probability" Martinez was the shooter. Garcia, 639 F. 3d at 1209. They indicate the three had been drinking beer with Martinez at the pool hall from the evening of December 20th through around 3:00 a.m. on the 21st; indicate Martinez and Vela Miranda argued and walked away from the group; give some indication as to the tenor of the argument and some of the words Martinez and Vela Miranda exchanged; and indicate that shortly after moving away from the group Vela Miranda was shot and killed—Martinez being the only other individual in close proximity. According to at least one witness, Martinez was the one who shot Vela Miranda; and all three witnesses stated that after the shooting, Martinez walked away from the scene and towards the house where he was staying. The evidence also gives a fair probability that the Martinez in these proceedings is the same person who was staying in the town, given the witnesses' statements and the authorities interactions with Martinez's wife the following day. Each of these facts is a piece of the puzzle that leaves the undersigned with "a reasonable ground to believe" Martinez is the person who shot Vela Miranda on the night in question. Mirchandani, 836 F.2d at 1226; see also Quinn, 783 F.2d at 815 (noting the differing standards between a probable cause finding and the evidence required for conviction) (citing Escobedo v. United States, 623 F.2d 1098, 1102 & n.10 (5th Cir.) (single photograph identified by witness sufficient to support probable cause finding)).

Further, while some irregularity might be present with the Mexican authorities' procedures in collecting the witness's statements, including the use of Martinez's passport as a means for the witnesses to identify him and the fact that the statements were not given under oath, these do not render the evidence submitted to be tainted in the same way as in those cases cited by Martinez in his brief. In In re Extradition of Chavez, the court noted the primary source tying Mr. Chavez to the crime were two statements given 7 years after the shooting by two illiterate farmers who had not witnessed the crime but only knew a similarly named person killed their relative. 408 F. Supp. 2d 908, 913-914 (N.D. Cal. 2005). In In re Extradition of Gonzalez, the court determined the accused should be released on bail pending an extradition hearing because the evidence showed that, on the date of the bank robbery, the accused was hundreds of miles away from the scene, and the eyewitness statements were not given until six months after the robbery

and after U.S. authorities sent Mexican authorities pictures of Gonzalez. 52 F. Supp. 2d 725, 733 (W.D. La. 1999). Here, the three witnesses gave their statement the day after the shooting. Additionally, they stated they had been with Martinez drinking beer since earlier in the evening and up through the shooting, and so would have known Martinez prior to being shown the passport photo containing Martinez's name. Manta v. Chertoff, 518 F.3d 1134, 1145 (9th Cir. 2008) (finding no error where the magistrate judge in an extradition proceeding credited the witness's identification of the accused, even though the witness was shown the accused's passport containing personal information, where the witness had prior interactions with the accused). Further, the Ninth Circuit has recognized that "unsworn hearsay statements contained in properly authenticated documents can constitute competent evidence to support a certificate of extradition." Artukovic v. Rison, 784 F.2d 1354, 1356 (9th Cir. 1986).

Thus, the undersigned rejects Martinez's argument that the evidence is insufficient to tie him to the shooting in December of 2013.

## II. Evidence Concerning a Homicide with Unfair Advantage

Martinez has been charged with "Intentional Aggravated Homicide." (ECF No. 45-1 at 90.) Article 219(I) defines "aggravated" as a homicide committed with "premeditation, unfair advantage, lying in wait, or treachery." (Id. at 131.) The Article further states that "unfair advantage" exists when:

> (a) the perpetrator is significantly stronger than the victim or the victim is unarmed; (b) the perpetrator is stronger due to the weapons they use, due to greater skill with those weapons or due to the number of persons accompanying them; or (c) the perpetrator's life is not endangered by the victim as perpetrating the crime.

Martinez contends the evidence presented is insufficient to establish the murder was carried out with "undue advantage." He first argues the Mexican judge who issued the warrant failed to cite Article 219(I), instead relying on a dictionary definition of "advantage" without addressing the "undue"/"unfair" portion. Additionally, Martinez argues there is a lack of evidence to show: (a) Martinez was stronger or Vela Miranda was unarmed; (b) Martinez was stronger due to his use of or skill with a gun or support from others, or due to Vela Miranda's inferior weapon; or (c) Martinez's life was not endangered by Vela Miranda. He contends these

1  potential situations are undermined by the fact that Vela Miranda apparently started the argument
2  that led to his death, the witnesses did not all state they saw the shooting, and Vela Miranda's
3  right hand showed traces of gunshot residue. (See ECF No. 52-1.) Given these facts, Martinez
4  argues he cannot be extradited on the specific charge of Intentional Aggravated Homicide.

5  　　　Martinez's arguments are unpersuasive for the mere fact that there are multiple ways to
6  treat the witnesses' statements. For example, hypothetically, Martinez might wish to argue at a
7  trial that *Vela Miranda* was the armed individual, and after a brief struggle Martinez was able to
8  turn the gun away from him as it fired, killing Vela Miranda. The jury might believe Martinez
9  and disbelieve the eyewitnesses, given the slight inconsistencies in the eyewitnesses' statements
10 given to the authorities at various points. This kind of testimony might even result in an acquittal.
11 But it is just as easy to interpret the evidence as indicating Martinez pulled a gun, aimed it at Vela
12 Miranda, and just before Martinez pulled the trigger, Vela Miranda attempted to wrest it away
13 with his right hand. These potential interpretations do not indicate a lack of evidence, as
14 Martinez argues, but instead go to the credibility of the eyewitnesses' statements, any contrary
15 statement Martinez might make, and these facts' correlation with the hard evidence in this case.
16 See Sainez v. Venables, 588 F.3d 713, 717 (9th Cir. 2009) (finding that sworn statements of
17 witnesses can form the basis of a probable cause determination, and reminding that an extradition
18 proceeding "makes no determination of guilt or innocence[;] guilt remains to be determined in the
19 courts of the demanding country").

20 　　　The same logic applies to Martinez's request for the court to admit and consider the
21 additional forensic report, attached as Exhibit 1 to the opposition motion—that it is contradictory
22 in nature. (ECF No. 51-1.) Martinez argued at the hearing that the extradition packet references
23 this forensic report, but Mexico did not include the report itself. Thus, he contends the report
24 should be admitted as "explanatory" evidence because it further elaborates on those references in
25 the extradition packet. See Hooker v. Klein, 573 F.2d 1360, 1368 (9th Cir. 1978) (holding that
26 "the fugitive . . . is not permitted to introduce evidence on the issue of guilt or innocence but can
27 only offer evidence that tends to explain the government's case of probable cause.") The court
28 recognizes that it "has broad discretion to determine the admissibility of the evidence before it,"

and is reminded that the line between what is 'explanatory' and what is 'contradictory' is "easier stated than applied." Santos, 830 F.3d at 992, 1007. However, it appears that Martinez's true purpose in offering this exhibit is to argue that Vela Miranda himself was armed, which arguably calls into question the "unfair advantage" portion of the charge. There is no other apparent reason that the defendant wants to "explain" the government's evidence. Similar to the eyewitness statements, this seems to be a question of fact for Mexican jurors to resolve. To wit, if the jury believes Vela Miranda was armed, this may result in an acquittal on this charge due to the failure of the prosecutor to prove the "unfair advantage" element; however, the jury could just as easily believe Vela Miranda had residue on his hand because he reached for Martinez's gun just before Martinez pulled the trigger. This issue is not one for the court to consider here but is left for trial in Mexico. See, e.g., Gomez v. United States, 2023 WL 2163474, at *6 (D. Or. Feb. 21, 2023) (finding fugitive's proffered evidence properly excluded where the "crux" of the evidence was to contradict whether the victim held a gun and was shooting at the fugitive, in the face of evidence indicating the victim was found unarmed and no witnesses saw the victim aim or shoot at the fugitive); Manrique v. O'Keefe, 2022 WL 1212018, at *12 (N.D. Cal. Apr. 22, 2022) (finding document properly excluded in extradition hearing where, even though it was being offered to explain ambiguities, it ultimately would only be useful in contradicting evidence in the extradition packet; noting that courts in California "have generally admitted evidence in extradition proceedings where the evidence would completely negate probable cause."). Thus, because Martinez's exhibit does not "obliterate" probable cause, the court declines to admit the forensic report. Santos, 830 F.3d at 992-93.

////
////
////
////
////
////
////

**ORDER**

For the reasons stated above, the court GRANTS the U.S.'s motion for certification of extradition.  (ECF Nos. 6, 45.)  The Clerk of the Court shall forward a certified copy of this Certification, together with a copy of the evidence presented in this case, to the Secretary of State.[3]

Dated:  February 24, 2023

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

sant.125

---

[3] The undersigned also denied government's request to immediately remand Martinez into custody.

14